# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Paula Gambeski ) | |
| 87 Hawthorne Drive ) | |
| Bedford, NH  03110 ) | |
| ) | |
| v. ) | Civil Action 1:22-cv-00320-AJ |
| ) | |
| UPS Supply Chain Solutions, Inc. ) | |
| 52 Pettengill Road ) | |
| Londonderry, NH 03053 ) | |

## Complaint[1] and Request for Jury Trial

1.      a. This is a civil action brought under the federal anti-discrimination/employment laws of the United States: Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e, et seq., for sexual harassment, and retaliation (Counts I-II); and under state law, N.H.R.S.A. 354-A for sexual harassment (Count III).

    b. A jury trial is requested.

## Jurisdiction and Venue

2. Jurisdiction for the federal Title VII claims exits under federal question jurisdiction, 28 USC §1331, 28 USC §1343 and, respectively, under 42 USC §2000e-5(f)(1). Jurisdiction for the state law claims exists under supplemental jurisdiction, 28 USC §1367(a).

3. Venue is proper under U.S.C. § 1391 and 42 U.S.C. § 2002e-5(f)(3).

---

[1] Filed pursuant to Order of 8-19-22 on Parties' Joint Assented Motion for Procedural Order

**Timely Filing**

4.      a. These counts are timely filed, as they are filed within the 90 days of the receipt of Plaintiff's Right To Sue letter from the EEOC dated August 16, 2022 (**Attachment A**) (see below); and

   b.  the state law claims are before this court as the result of Defendant UPS removing them from the NH Commission for Human Rights (NHCHR),

   c.  precluding Defendant from asserting the 3-year statute of limitations applicable to cases removed from the NHCHR by the Plaintiff.

**Exhaustion of Administrative Remedies**

5.      a. Plaintiffs timely co-filed the above charges of discrimination under state and federal law with the N.H. Commission of Human Rights (NHCHR) and the Equal Employment Opportunity Commission (EEOC), respectively.

   b. These administrative complaints, as amended, were pending at the NHCHR/EEOC from April 17, 2017 until Defendant removed them to Hillsborough County Superior Court (Northern District) on 7-22-22.

6.      a. Plaintiffs' filings with the EEOC were made over 180 days ago and were not been resolved during the administrative process.

   b.  Upon Defendant's removal to Superior Court, Plaintiff requested, and thereafter received, the above-referenced EEOC Right To Sue Letter (**Attachment A**).

## The Parties

7.      a. Plaintiff is an adult woman residing in Bedford, New Hampshire.

      b. At relevant times she was employed by Defendant in Londonderry, New Hampshire.


8. Defendant UPS Supply Chain Solutions, Inc.) ("UPS"):

      a. UPS is a wholly owned business unit of United Parcel Services, Inc.

      b. UPS is a wholly owned subsidiary of United Parcel Service, Inc.

      c. UPS has over 481,000 employees worldwide.

      d. UPS has over 850 locations around the world.

      e. UPS is incorporated in Delaware.


## Some Facts

9.      a. Plaintiff was hired by Defendant on June 29, 2015 to work at the Londonderry, NH facility.

      b. That facility processed and shipped parts for Pratt and Whitney.

      b. Plaintiff was hired as a kitter.

      c. Plaintiff was promoted in September 2015.

      d. Plaintiff was promoted to a job whose tasks were to audit quality (quality assurance).


## Re: Cliff Smith, UPS Management

10.      a. During the fall of 2015, approximately September - October, a UPS management employee, Cliff Smith arrived from Georgia.

b. Smith was assigned by UPS in the chain of Plaintiff's supervisors.

c. Samantha Johnson was employed by Defendant during Plaintiff's employment with Defendant as a "Quality Specialist" with supervisory authority over me.

d. Samantha Johnson refused to work with Smith.

e. Smith was a supervisor of Samantha Johnson.

f. Samantha Johnson alleged that Smith of asked her sexual questions.

g. Samantha Johnson alleged that Smith touched her body without her permission.

h. Samantha Johnson reported Smith's sexual harassment.

i. Samantha Johnson reported Smith's sexual harassment to UPS management in Kentucky.

j. Samantha Johnson reported Smith's sexual harassment to UPS manager Kenny Mills.

k. Samantha Johnson reported Smith's sexual harassment to UPS manager Dan Doane.


11. Cliff Smith sexually harassed Plaintiff during the time he was a UPS supervisor assigned to the Londonderry facility between 2015 and 2016.


12. Among the sexual harassing acts that Smith directed at Plaintiff as she sat in the Quality Assurance Office at a desk and the circumstances are as follows:

a. He said to Plaintiff, "You've got a nice ass, Paula."

b. He said to Plaintiff, "You are stacked."

c. He said to Plaintiff, "Jennifer is my 'go-to-girl' in Georgia.  I'm looking for a 'go-to-girl' here in Londonderry.

d.  There was no doubt he meant 'go-to-girl' as a sexual partner.

e. Smith stood behind Plaintiff, leaned into her, and touched her back.

f. Smith put his hands-on Plaintiff's lower back.

g. Smith came around to Plaintiff's side and pulled up a chair and crowded her physically into her desk.

h. Plaintiff told Smith to "back off."

i. Plaintiff told Smith that he was "invading my personal space."

j. Plaintiff gestured for Smith to back up.

k. Plaintiff told Smith to "stop it."

13. Smith required Plaintiff and others to provide him with personal cell phone numbers, allegedly for work-related communications.

14. Smith texted Plaintiff his hotel numbers.

15. Smith texted Plaintiff to invite her for drinks.

16. Once when Plaintiff was waiting for a ride because her son had her car, Smith repeatedly pressured her to accept a ride home from him.

17. Plaintiff did not want to get into a car with him.

18. Plaintiff told Smith that she didn't want a ride with him.

19. Smith pressured her and said, "*If you don't get into this car, we'll have problems at work.  We need to work together. We need to get along."*

20.  As a result of Smith's pressuring her, Plaintiff got into his car and he drove to her home.

21. When they got to Plaintiff's home, Smith tried to go in with her.

22. Plaintiff told Smith, *"I do not f--k around with married men, and you are married.  I am not interested in married men."*

23.  Smith replied, *"My wife won't have anything to do with me."*  Then he told the story about JB (use of only initials here is intentional; Smith used her whole name) and how JB was his "go-to-

girl" in Georgia and how their sexual relationship was beneficial to her; that she had been promoted and that Plaintiff "*could have the same benefits."*

24. Plaintiff reported this to Samantha Johnson promptly.

25. Samantha Johnson reported this to Kenny Mills and Dan Doane, the same two management officials she had reported her own harassment by Smith before Plaintiff had been sexually harassed by Smith.

26.  Smith was fired soon after.

27. UPS informed the NHCHR that Smith had not been fired, but had "voluntarily resigned."

28. About a month later, JB was fired.

29. UPS management informed other UPS employees that JB was fired for alleged problems with her expense reports.

30. After Plaintiff refused Smith's advances, and while he was still in New Hampshire supervising her, and before his termination, in retaliation,

     a. Smith began to micromanage Plaintiff.

     b. Smith was nasty to Plaintiff.

     c. Smith questioned "every little thing" Plaintiff did.

31. In response to Smith's retaliatory actions above

     a. Plaintiff made excuses to not work with him;

     b. Plaintiff did not come in on Saturdays she otherwise could have worked.

     c. Plaintiff reported this retaliation to Samantha Johnson.

    d. At this time, Samantha Johnson's boss, Quality Assurance Manager, Scott Gregory had resigned.

    e. At this time, UPS manager Kenny Mills told Plaintiff to report to Samantha Johnson.

**Re: Jeremy Helming, UPS Management**

32. In October 2015, for about three weeks, Plaintiff's supervisor was Scott Gregory.

33.  In October 2015, Jeremy Helming became Plaintiff's supervisor when he was hired to replace Scott Gregory.

34.  Helming got angry at Plaintiff for informing him that he should spend time out on the floor so he would know what his employees did in their jobs.

35. In retaliation, Helming "wrote Plaintiff up."

36.  In retaliation, Helming required Plaintiff to work on Christmas Eve even though he let temporary employees have the day off.

37. UPS had informed UPS employees that UPS employees "had seniority" in assignments over temporary employees.

38.  Plaintiff informed Helming that UPS employees were supposed to "have seniority" in assignments over temporary employees.

39. Helming told Plaintiff that her attendance on Christmas Eve was mandatory *because* she was a UPS employee.

40.  Plaintiff came to work on December 24, 2015, but there was no work for her to do.

41. Plaintiff so informed Helming, who ordered her to go to a different department.

42. Helming gave Plaintiff a tape scraper and ordered her to get down on the floor and scrape tape off the floor.

43. Plaintiff told him that wasn't her job.

44. Helming retorted, *" What?  Are you too good to bend over, Paula?  You don't want to bend over?"*

45. It was clear that Helming was trying to look at Plaintiff's fanny.

46. Plaintiff left the area, feeling disgusted.

47. Helming wrote Plaintiff up again.

48. Helming thus used sexual harassment to retaliate against Plaintiff for asking him to do his job and to come out onto the floor to see what his employees were supposed to do.

49. Subsequently, on several occasions, Helming told Plaintiff that he liked the way her jeans looked on her, and while doing so used a facial expression and body language implying sexual interest in Plaintiff.

50. Plaintiff was afraid to report this because she had been informed that Helming repeatedly said he wanted to get her fired.


**Re: Kevin Jenkins, UPS Manager Trainee**

51. During 2015-2016 Jenkins was a Lead in the Kitting Department.

52. During 2016 he said to Plaintiff, "*Paula, you have a nice ass; bend over."*

53. Subsequently during 2016, Jenkins would verbally sexually harass the Plaintiff, using a sleazy voice, including with these statements:

    a. "*Did you get f---d last night, Paula?"*

    b. "*Looks like you got f--d last night, Paula."*

    c. "*You are one fine woman*."

    d. "*Are your tits real?"*

    e. "*Let me touch your ass.*"

    f. "*How old are you.*"

    g. "*Do you have sex to stay in shape?*"

    h. "*Let's have sex.  Have sex with me.*"

    i. "*Did you ever see a black dick*?"

54. Jenkins stuck his tongue out at Plaintiff and leered.

55. Jenkins grabbed Plaintiff's butt.

56. At the time, Esther _____ was a human resources employee with UPS.

57. At the time, Esther _____ was a human resource manager for the building.

56. Plaintiff reported Jenkins' sexual harassment directly to Esther _____ in the Human Resources Office.

57. In response to Plaintiff's oral report, Esther _____

    a. just shook her head and promised to "look into it."

    b. promised to "get back to" Plaintiff.

58. During Esther's employment at Plaintiff's UPS facility, Stephanie _____ also worked at Human Resources.

59.  Plaintiff also reported Jenkins' harassment to Stephanie _____.

60.  Plaintiff also reported Jenkins' harassment to Jeremy Helming.

61. Plaintiff also reported Jenkins' harassment to her direct supervisor, Jim Mulcahey.


**Re: Kevin Frost, Michelle Chivers and Dale Houston**

62.  **Kevin Frost** became Production Operations Manager during 2016.

63. Kevin Frost:

    a.  advised Chivers to apply to UPS;

    b. from outside UPS and she was hired;

    c. to become an outbound shipping clerk;

    d. under Frost's supervision; and

    e. Frost moved her to Quality, permanently, as an auditor;

    f. and directed Plaintiff to train her.

64. There were allegations by other employees that Frost and Shivers were having an affair.

65. In 2016 there was an employee in Human Resources at the facility named **Jessica** Swanson.

66. In 2016 Plaintiff's building manager was **Julie** _____.

67.    a.  Plaintiff reasonably concluded that since Frost supervised Chivers, any intimate relationship, as rumored, would be inappropriate and possibly exploitive of the subordinate;

    b. Accordingly, Plaintiff reported what she had been told to Jessica Swanson in Human Resources and to the building manager, Julie _____.

68.  During 2016, **Dale Houston** was a UPS employee at the Londonderry facility.

69. During 2016, Dale Houston was supervised by Kevin Frost.

69. During 2016, Dale Houston was promoted by Kevin Frost, who continued to supervise him.

70. During 2016 Dale Houston had learned of Plaintiff's reports to Human Resources about Frost and Chivers.

71.    a. During 2016 Dale Houston confronted Plaintiff and told her that he was going to report her because she had gone to Human Resources (to report what she had been told: that his boss, Kevin Frost, was having an affair with Frost's subordinate, Michelle Chivers).

    b. At the time, it was Plaintiff's understanding that a supervisor having an affair with a subordinate violated UPS sexual harassment policies and rules.

72. During 2016 Dale Houston sexually harassed Plaintiff by walking up in front of her and putting his hands right in front of her breasts, opening and closing his fingers in a squeezing motion.

73. While Dale Houston was opening and closing his fingers in a squeezing motion, he asked Plaintiff, "*Can I help you?*"

74. This sexual harassment of Plaintiff was witnessed by Kevin Frost, who could have, and should have stopped it, and reported it, but who did not.

75. At the time, Kevin Frost had "gone over to the Department side," but he was still management.

76. Houston's confronting Plaintiff and threatening to report Plaintiff and sexually harassing Plaintiff were *in retaliation* for her reporting to human resources the allegations she had heard about Kevin Frost and Michelle Chivers.

77. Plaintiff personally witnessed the following inappropriate behavior/"sexual activity" between Frost and Chivers as follows:

      a. Plaintiff saw Frost touch Chivers' breasts.

      b. Plaintiff saw Frost touch Chivers' butt.

      c. Plaintiff saw Frost touch Chivers' waist.

      d. Plaintiff saw Frost touch Chivers' hair.

78. This inappropriate behavior, when witnessed by Plaintiff, made her very uncomfortable.

79. This inappropriate behavior, witnessed by Plaintiff, created for her, a hostile atmosphere of sexual harassment.

80. During 2016, Kari _____ was a second shift employee in Londonderry.

81. During 2016, Kari was a second shift auditor.

82. During 2016, Brad Hansford was a UPS employee in Londonderry.

83. During 2016, Brad Hansford was a production lead.

84. During 2016, Jim Mulcahey was a quality assurance supervisor.

85. During 2016-2017 Jim Mulcahey was Plaintiff's supervisor.

85. During 2016 Plaintiff reported her discomfort about the Frost/Chivers sexual activity she had observed, and her discomfort about the same to each of the above Kari_____, Brad Hansford and Jim Mulcahey.

86. During 2016 Frost was promoted to head of first shift production, and Houston and Hansford reported to Frost.

87. During 2016 Frost was promoted to Operations Manager of the Londonderry facility and Houston and Hansford reported to Frost.

88. During 2017 Jim Mulcahey, Plaintiff's supervisor, told her:

     a. he could no longer save Plaintiff's job because Frost had too much power;

     b. it had been Frost and Chivers who had sabotaged Plaintiff's carts; and

     c. to find another job.

89. Michelle Chivers was an auditor.

90**.** After Plaintiff reported Frost/Chivers as above described:

     a. Chivers falsely accused Plaintiff of having an affair with her supervisor, Jim Mulcahey and receiving favorable treatment in return;

     b. Frost falsely accused Plaintiff of having an affair with her supervisor, Jim Mulcahey; and

     c. Samantha Johnson falsely accused Plaintiff of having an affair with Plaintiff's supervisor, Jim Mulcahey.

91. These false allegations by Frost, Chivers and Johnson were ***in retaliation*** for Plaintiff's reporting the Frost/Chivers behavior.

92. Good faith reporting of a supervisor's reported affair with a subordinate was authorized by Defendant's sexual harassment policies.

93. During 2016-2017, there a temporary employee, Sarah _____ on Plaintiff's shift who told both Plaintiff and Plaintiff's supervisor, Jim Mulcahey, that Michelle Chivers had urged Sarah to falsely report Plaintiff.

94. Chivers **retaliated against** Plaintiff for her report to Human Resources by sabotaging Plaintiff's work cart so she would get a "turn back" (mistake).

95. Such mistake/s would reflect poorly on Plaintiff's performance.

96. Another employee told Plaintiff that the employee had witnessed Chivers going through Plaintiff's carts (touching items in her cart) in sight of both Kevin Frost and Dale Houston.

97. Chivers had no appropriate reason to go through Plaintiff's carts.

98. Failure of Frost and Houston to prevent, or to stop, Chivers from going through Plaintiff's carts was in retaliation for Plaintiff's report to Human Resources about Chivers and Frost.


**Re: Harassment by Dave** _____

99. In 2015-6, there was a Production Lead named Dave _____ who worked during Plaintiff's shifts.

100. Dave _____ harassed Plaintiff at least twice a week between the fall of 2015 and the fall of 2016 as follows:

    a. Dave asked Plaintiff out regularly.

    b. She always declined.

    c. Dave would come up behind Plaintiff and grab her.

    d. Dave would come up behind Plaintiff and rub her back down to her butt.

e. Dave did these things right on the floor in front of the other workers.

f. Each time, Plaintiff expressed her disgust.

101.  Plaintiff reported Dave's harassment to:

a.  Esther _____ in Human Resources;

b. Stephanie _____ in Human Resources; and

c. my supervisor, Jim Mulcahey.

102. Esther

a. said she would take care of it, but never wrote anything down in Plaintiff's presence;

b. never got back to Plaintiff.

103.  Neither Jim nor Stephanie got back to Plaintiff.

**Re: Harassment by "Kenny" (Ken _____ )**

104.  During Plaintiff's employment there was a Production Package Handler named Ken _____ .

105.  His boss was Brad Hansford.

106. Plaintiff had given her cell number to Brad Hansford so he could call if he needed a ride to work.

107. Kenny texted a photo of his penis to Plaintiff.

108. Kenny asked Plaintiff out repeatedly.

109. Plaintiff always declined Kenny's invitations.

110. Plaintiff reported Kenny's penis text to Jim Mulcahey and to Brad Hansford.

111. In response, Brad Hansford asked Plaintiff to "hook up."

112. On or about March 2017, Kenny picked the Plaintiff up by her butt, from behind, putting his hands near her vagina, while she was in an 18-wheeler looking for a cart she had audited.

113. Plaintiff screamed and ran from the truck.

114. Brad Hansford asked why she was screaming and Plaintiff told him what Kenny had just done.

115.  Hansford replied, "*Well, do you blame him? Look at your ass!*"

116.  Plaintiff reported to Stephanie _____ in Human Resources, who was out on the floor, what Kenny had done.

117. Stephanie _____ said, "*I'll look into it and get back to you.*"  She did not get back to Plaintiff.

118.  Plaintiff also reported to Stephanie how hurt she was by the false rumors that Jim Mulcahey and Plaintiff were having an affair.

119. Plaintiff asked Stephanie _____ for her assistance to stop the false gossip.

120. Plaintiff was so upset, she punched out early.


**Re: Harassment by Julie _____ (Division Manager)**

121.  Ollie Spencer, Senior Area Logistics & Distribution Manager was replaced by Julie _____.

122.   Julie _____touched Plaintiff by rubbing her back when she spoke with Plaintiff.

123.  Plaintiff did not like it but, there was no one above Julie at the Londonderry facility to report Julie's behavior.

124.  Julie did this out on the floor, walking up to Plaintiff and rubbing her back and asked, "*How's Audit going today?*"

125. Plaintiff had a meeting in Julie's office with Jessica Swanson (HR) and reported the sexual harassment Plaintiff had suffered, including, but not limited to, from Cliff Smith, Kevin Jenkins, Kevin Frost and Dale Houston and Kenny_____ .

126.  Julie responded, "*Did you get it all out?  Do you feel better now?  Let's move on."*

127. That crushed Plaintiff and made her feel helpless.


**Harassment by Christy**

128.   In the first quarter of 2017 Plaintiff was harassed by Kenny _____ (above) and Christy almost daily.

129. Christy was a temporary employee whose faulty shipments were passed by Michelle Chivers.

130.  Plaintiff would not pass Christy's bad shipments (wrong parts, over or under on counts, packaging issues).

131. In retaliation, Christy would become very angry at Plaintiff and call her "Bitch," and "Cunt," and Christy would talk about anal sex on the work floor.

132.   a. This was offensive to Plaintiff; and

   b. Plaintiff reasonably believed this was sexually harassment.

133.   a. Plaintiff reported Christy's above behavior to Christy's supervisor, Dale Houston and to Plaintiff's supervisor, Jim Mulcahey and to Jessica Swanson, Human Resources.

   b. There was an email about this.

   c. No action was taken on Plaintiff's reports.


**Harassment by Carl**

134.   a. Carl _____ was a package handler with Kenny _____ in outbound shipping.

   b. Carl _____ texted to Plaintiff a cartoon of a face whose big nose was a long penis.

135. Plaintiff reported this to her supervisor, Jim Mulcahey and to Brad Hansford, Mulcahey's boss, but they took no action.

**Retaliation and Retaliatory Termination**

136.  By April 17, 2017 Plaintiff's supervisor, Jim Mulcahey had become hostile towards her because he blamed Plaintiff for placing his job in jeopardy because of her above reports of harassment and retaliation.

137.        a. On April 19, 2017 Jim Mulcahey came up to Plaintiff at the audit table; and

b. questioned her repeatedly,

c. invaded her personal space,

d. talked over her, and

e. would not allow her to speak.

138. Plaintiff put her pen down and walked away, heading to Human Resources to report this.

139. As Plaintiff walked away, Mulcahey yelled at her, "*Don't walk away from me!*"

140. Plaintiff reasonably understood that she had the right to go to Human Resources to be safe and to stop this conduct.

141.         a. Mulcahey ran after her and when he caught up, walked next to her.

b. This was very upsetting and intimidating to the Plaintiff.

142. Plaintiff reached the door to Human Resources.

143. As Plaintiff went to open the door with her key fob, Mulcahey pushed her away so he could use his key fob and be the first through the door.

144. Plaintiff was shaken, shaking, and afraid, and yelled at him not to touch her.

145. Mulcahey came towards Plaintiff and a couple of employees held him back and told him "*It's not worth it, Jim.*" and "*Don't go after her;*" or something like that.

146. Plaintiff rushed to Jessica Swanson's office in H.R. and closed the door, still shaking.

147. Mike Esseg came into the office and told Jessica Swanson to stop talking with Plaintiff.

148. So Plaintiff left Swanson's office, gathered her personal belongings and proceeded to punch out for the day.

149. Jessica Swanson said, "*Don't punch out, work the remainder of the day.  Are you choosing to leave*?"

150. Plaintiff told Jessica Swanson that she didn't feel safe and was going to the Police Department.

151. Plaintiff went to the Police Department and filed an assault charge.

152. That evening, Jessica Swanson called Plaintiff and told her to not report to work until further notice.

153.  On April 21, 2017, Jessica Swanson called Plaintiff to come into the Human Resources office and asked Plaintiff to write a report.

154.  Plaintiff declined, because, as she explained, she had already written a report for the Police Department and didn't want to be pressured to write it again.

155.  Jessica Swanson told Plaintiff to leave the building, said Plaintiff was still employed, but refused to return Plaintiff's badge.

156.        a. Plaintiff told Jessica Swanson that she was denying Plaintiff's access to the building.

b. Swanson laughed at the Plaintiff.

157.        (a)Plaintiff asked for her personnel file and FMLA paperwork (previously requested and previously denied), but

(b) Jessica Swanson refused to provide either file.

158.  Plaintiff left the building as Jessica Swanson had requested.

159. On April 26, 2017 in a phone call Jessica Swanson told Plaintiff that Plaintiff was fired for violating work rules.

160.  Other employees went to Quality Assurance management to report how unfairly Plaintiff had been treated.

161. At least one of these employees reported that Michelle Chivers had directed her to go to Human Resources to complain that Plaintiff was creating a hostile environment.

162. Prior to the incident at the door with Mulcahey, none of her complaints about sexual harassment or retaliation resulted in anyone getting back to her to report on an investigation, or to report any action taken, or to see how Plaintiff was doing, or to determine if Plaintiff was suffering further retaliation.

163.  The above described conduct constitutes a continuing violation of sexual harassment, sex discrimination, retaliatory harassment and retaliation from September 2015 through Plaintiff's termination in April 2017.

164.  Defendant failed to take any remedial action reasonably calculated to prevent Plaintiff's harassment.

165. Defendant failed to take remedial action reasonably calculated to address the harassment that occurred.

166. Defendant failed to take action reasonably calculated to protect Plaintiff from retaliation after Plaintiff reported the incidents of workplace harassment and retaliation.

167. Defendant failed to be respectful of Plaintiff's reports, complaints and/or suffering.

168. Defendant's above-described acts and lack of action (lack of preventative and responsive actions) constitute malice and/or reckless indifference to Plaintiff's federally protected rights under Title VII.

169. Defendant's above-described acts and lack of action (lack of preventative and responsive actions) constitute willful and/or reckless disregard of my rights under RSA 354-A.

### Count I: Sexual Harassment Under RSA 354-A

170.  All above paragraphs are incorporated by reference.

171.    a.   The above acts, including, but not limited to, those acts alleged in above paragraphs11,12, 14, 15, 16, 19, 21, 23, 42, 44, 49, 52, 53, 54, 55, 72, 73, 77, 100, 107, 108, 109, 111, 115, 122, 124, 131, and 134 constitute sexual harassment,

      b. for which Defendant is liable;

      c. all said acts were unwanted and uninvited by Plaintiff;

      d.  all said acts were subjectively sexually harassing;

      e.  and all such acts were objectively sexually harassing.

172. The above acts created a hostile work environment.

173. The above acts constituted a continuing violation.

174.   As a result of the above harassing acts, Plaintiff suffered:

      a. injury to her career;

      b. pain and suffering;

      c. embarrassment /humiliation;

      d. loss of enjoyment of life;

      d. lost pay and benefits;

      e. attorney fees and costs.

## Count II. Sexual Harassment Under Title VII

175.  All above paragraphs are incorporated by reference.

176.   a.  The above acts, including, but not limited to, those acts alleged in above paragraphs11,12, 14, 15, 16, 19, 21, 23, 42, 44, 49, 52, 53, 54, 55, 72, 73, 77, 100, 107, 108, 109, 111, 115, 122, 124, 131, and 134 constitute sexual harassment,

       b. for which Defendant is liable;

       c. all said acts were unwanted and uninvited by Plaintiff;

       d.  all said acts were subjectively sexually harassing;

       e.  and all such acts were objectively sexually harassing.

177. The above acts of sexual harassment created a hostile work environment.

178. The above acts constitute a continuing violation.

179.   As a result of the above harassing acts, Plaintiff suffered:

       a. injury to her career;

       b. pain and suffering;

       c. embarrassment /humiliation;

       d. loss of enjoyment of life;

       d. lost pay and benefits;

       e. attorney fees and costs.

## Count III: Retaliation Under Title VII.

180. All above paragraphs are incorporated by reference.

181.       a. The above acts, including, but not limited to, those acts alleged in above paragraphs 30, 47, 48, 71, 76, 88, 90, 91, 93, 94, 98, 115, 126, 131, 136, 139, 141, 143, 145, 147, 152, 155, 156(b), 157(b), 159, 162, 164, 165, and 166 constitute retaliation, including by retaliatory harassment.

       b. for which Defendant is liable.

182.   The above acts of retaliation

       a. created a hostile work environment;

       b. constitute a continuing violation;

183.   As a result of the above retaliatory acts, Plaintiff suffered:

       a. injury to her career;

       b. pain and suffering;

       c. embarrassment /humiliation;

       d. loss of enjoyment of life;

       d. lost pay and benefits;

       e. attorney fees and costs.

**Requests for Relief:**

WHEREFORE PLAINTIFF REQUESTS:

I. Plaintiff requests a jury trial.

II. Injunctive Relief Requested:

A. That Defendant post notices in conspicuous places, required under NHRSA 354-A and 42 USC 2000e, et seq, and, as they may be amended.

B. That all senior managers of Defendant, at Defendant's expense, receive annual, live, anti-discrimination training reflective of both New Hampshire and federal anti-discrimination employment laws, all categories of discrimination, inclusive, which training

    1. shall be provided by an employment law attorney licensed to practice in New Hampshire with at least 10 years of experience in providing such training;

    2. shall be audio and visually recorded, a copy of which recording shall be provided for viewing to each other employee of Defendant during paid work hours, within twelve (12) weeks of the final judgment in this case; and

    3. each employee, manager and non-manager alike, shall be provided information sheets, both by paper copies, and by email electronic copies, which shall become the personal property of the employees, which information sheets list all the classes of illegal discrimination under state law and federal law, including the deadlines for filing complaints at the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission and including the information that a timely filing with the New Hampshire Commission for Human

Rights will constitute a timely filing with the Equal Employment Opportunity Commission, and which information sheets also shall include the telephone numbers, and email and physical mailing addresses of both Commissions.

### III. Damages Requested

A. Back pay and benefits under all state and federal counts;

B. Front pay and benefits under all state and federal counts;

C. Pain and suffering compensatory damages under all state and federal counts;

D. Punitive damages under all federal counts;

E. Enhanced Compensatory Damages under all state counts;

F. Pre-judgment interest and post-judgment interest for any judgment and/or verdict in Plaintiff's favor.

G. An additional monetary award to neutralize the additional taxes resulting from the award of lost pay and benefits relief, including but not limited to, "bracket creep" that results from any lost pay and benefits award.

### IV. Attorney Fees and Costs Requested

Attorney fees and costs under both state and federal law, including expert consulting and

### V.  Other Equitable and Legal Relief Requested

Other equitable and legal relief as this Honorable Court deems just and proper.

Respectfully submitted,
Paula Gambeski, by her Attorney

/s/ Nancy Richards-Stower
Law Offices of Nancy Richards-Stower
136 Portland Street
Yarmouth, ME 04096
office: 603-881-3312
nrichardssto@igc.org

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15 days of September 2022, I electronically filed the foregoing document using the CM/ECF system, to send notification of such filing to the following:

Melinda J. Caterine (NH Bar No. 16664)
LITTLER MENDELSON, P.C.
One Monument Square, Suite 600
Portland, ME 04101   Phone: 207.774.6001
mcaterine@littler.com

/s/ Nancy Richards-Stower